**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

[redacted]

Plaintiff,

v. Case No:

**METROPOLITAN LIFE INSURANCE COMPANY AND METLIFE DISABILITY**
200 Park Avenue
New York, NY 10166-0188

Defendant.

**Serve Registered Agent:**
THE CORPORATION TRUST COMPANY
CORPORATION TRUST CENTER
1209 ORANGE ST
WILMINGTON, DE 19801

## COMPLAINT

Plaintiff [redacted] ("Plaintiff"), by and through his attorneys of record, Kenneth C. Wu and Lopez & Wu, PLLC, alleges as follows:

1. This case against the Metropolitan Life Insurance Company and Metlife Disability ("Defendant" or "MetLife") is a claim for violation of statutory provisions of, and clarification of rights to disability benefits under, the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

## PARTIES

2. Plaintiff is a resident of [redacted].

3. Defendant is a Delaware corporation with its principal executive offices in New York, doing business in Washington, D.C.

**JURISDICTION AND VENUE**

4. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1332, and without limitation under the provisions of ERISA, 29 U.S.C. § 1132(e)(1) and § 1132(f).

5. Venue is proper pursuant to 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e)(2), as the plan is administered in the District of Columbia and the acts complained of occurred in the District of Columbia.

**FACTS**

6. Plaintiff was formerly employed as an associate attorney at [redacted] (“Employer”) in Washington, D.C.

7. As a benefit of his employment with Employer, Employer provided Plaintiff with short-term and long-term disability income coverage (the “Disability Benefits”). These Disability Benefits were provided through a group plan issued to Employer by Defendant (the “Plan”).

8. The Disability Benefits were part of an employee welfare benefit plan as defined in 29 U.S.C. § 1002(1) of ERISA.

9. The Plan defines “disabled” or “disability” as follows:

> **Definition of Disability—Legal Staff.** “Disabled” or “Disability” means that because of injury or sickness you are receiving appropriate care and treatment from a doctor on a continuing basis, and while you are unable to perform all of the material duties of your Regular Occupation:
>
> 1. during the Elimination Period:
>    a. you cannot perform each of the material duties of your Regular Occupation; or
>    b. you are performing at least one of the material duties of your Regular Occupation or another occupation on a part-time or full-time basis; and

c. you are earning at least 20% less per month of your Basic Monthly Pre-disability Earnings at your Regular Occupation or another occupation on a part-time or full-time basis.

2. after the Elimination Period:
   a. you cannot perform each of the material duties of your Regular Occupation; or
   b. you are performing at least one of the material duties of your Regular Occupation or another occupation on a part-time or full-time basis and earning at least 20% less per month than your Indexed Basic Monthly Pre-disability Earnings due to that same injury or sickness.

**If you are an attorney, "Regular Occupation"** means the specialty in the practice of law which you were practicing on the day prior to the date you became disabled.

10. Plaintiff's stressful and demanding occupation required him to work typically fourteen-to-sixteen hour-long days. Employer described Plaintiff's regular occupation in an email to Defendant on February 16, 2016, as follows:

> Represents clients in developing, financing, acquiring and selling energy and infrastructure projects. Junior associate level responsibility for aspects of the representations, include drafting documentation, legal research and analysis, and document review. As these types of matters often are critical to the business of the company, associate is expected to be available on short notice for late night and weekend work as required to meet client demands. The nature of these transactions requires coordinated real-time responsiveness and involves handling complex matters in a time sensitive fashion. Travel can be required from time to time, often on short notice.

11. Plaintiff went to the emergency room on December 11, 2014, and December 16, 2014, because of unexplained excruciating headache, cognitive dysfunction, stomach pain, eye pain, tinnitus, and fatigue. Only intravenous morphine mitigated Plaintiff's symptoms. Plaintiff was diagnosed by multiple doctors in January 2015 as having Lyme disease and Babesiosis (both tick-borne infections; the former bacterial, the latter parasitic). The diagnosis was based on (i) three positive Babesiosis laboratory test results dated January 11, 2015; January 14, 2015; and January 15, 2015, each from different laboratories and one of which was a blood smear in which the parasites were clearly visible, (ii) two indeterminate Lyme disease laboratory test results dated January 7, 2015, and January 14, 2015, (iii) clinical and physical evaluations, (iv) patient

symptomatology, and (v) patient response to treatment. Plaintiff began antibiotic and anti-parasitic treatment. Plaintiff moved to his parents' residence in January 2015 because he was no longer able to take care of himself due to his disabling symptoms.

12. On or about January 30, 2015, Plaintiff submitted to Defendant a claim for short-term disability benefits stating that he was unable to work due to infections of Lyme disease and Babesiosis.

13. Plaintiff stopped working on February 2, 2015.

14. Defendant sent Plaintiff a letter dated February 14, 2015, approving Plaintiff's claim for short-term disability benefits for February 2, 2015, through March 6, 2015. Plaintiff was paid short-term disability benefits of $170.00 each week during that time period.

15. Despite his persisting symptoms, Plaintiff returned to work on March 9, 2015, in order to earn an income and prevent his employer from terminating his employment if he did not promptly return to work.

16. On or about March 20, 2016, Plaintiff discontinued his antibiotic treatment at the recommendation of a new doctor.

17. Three days later, on March 23, 2016, Plaintiff's excruciatingly painful symptoms erupted and he rushed to the emergency room. Plaintiff developed a new symptom of excruciating testicular pain (later determined to be neurogenic in nature), in addition to his other persistent symptoms. As a result, Plaintiff went to the emergency room again on March 28, 2016, for the fourth time.

18. In April 2015 Plaintiff began a new treatment where he injected himself with intravenous liquid antibiotics (Rocephin) and other liquids each day for 28-days through a PICC line that had been inserted into his left arm. While working stressful fourteen-to-sixteen hour-

long days and suffering from a panoply of symptoms, Plaintiff underwent this treatment each day of April 2015 in a desperate attempt to recover and continue working. Plaintiff developed infections and rashes because of the PICC line.

19. On April 30, 2015, Plaintiff stopped working due to the severe persistence of his symptoms and submitted a claim for short-term disability benefits.

20. On May 7, 2015, Defendant only approved Plaintiff's short-term disability benefits from May 4, 2015, to May 29, 2015, and paid Plaintiff short-term disability benefits of $170.00 each week during that time period. Defendant also requested additional medical documentation to justify the short-term disability benefits.

21. On June 2, 2015, in an effort to extend his short-term disability benefits, Plaintiff submitted an "Attending Physician Supplemental Statement" along with doctor notes and lab test results as requested by the Defendant.

22. On July 7, 2015, Plaintiff sent Defendant (i) doctor's notes from his last visit to his treating doctor, Dr. Joseph Jemsek, a Lyme disease specialist, (ii) a letter from Dr. Jemsek supporting Plaintiff's claim for disability benefits, (iii) a letter from Dr. Sam Pappas, Plaintiff's primary care physician [redacted], supporting Plaintiff's claim for disability benefits, and (iv) a letter from Dr. Richard Cho, Plaintiff's neurologist, supporting Plaintiff's claim for disability benefits.

23. Defendant hired Dr. John Brusch, who wrote two independent physician consultant reports dated June 20, 2015 and July 23, 2015, recommending that Defendant deny Plaintiff's short-term disability claim. Among other false assertions, Dr. Brusch inexplicably wrote, "There is also no historical, laboratory examination findings that substantiate this claimant has suffered from the disease Babesiosis," despite Plaintiff providing three positive Babesiosis

laboratory test results, each from a different laboratory. Dr. Brusch never spoke to Plaintiff's doctors and never spoke to or examined Plaintiff. Dr. Brusch was not bound by a duty of care to Plaintiff, nor can he be sued by Plaintiff for medical malpractice, because he did not have a doctor-patient relationship with Plaintiff.

24. On July 28, 2015, via written correspondence, Defendant denied Plaintiff's claim for short-term disability benefits beyond May 29, 2015, based on Dr. Brusch's conclusions. In its denial letter Defendant concluded that Plaintiff was "no longer unable to perform the regular duties of [his] employment," despite Plaintiff's persistent disabling symptoms.

25. On August 25, 2015, through his counsel, Plaintiff submitted an appeal letter for his short-term disability benefits. The letter clearly explained that the Defendant had incorrectly denied Plaintiff's claim for short-term disability benefits because (i) Dr. Brusch's conclusion that there was no evidence of a Babesiosis infection was wrong, (ii) lab test results for Lyme disease are notoriously inaccurate and therefore an indeterminate or negative test result does not preclude an infection of Lyme disease, and (iii) Plaintiff is "disabled" as defined in the Plan. The letter also included the three positive Babesiosis lab test results, citations to fifteen medical journal articles supporting the inaccuracy of Lyme disease tests, the three supporting letters from Dr. Jemsek, Dr. Pappas, and Dr. Cho, and citations to forty-three medical journal articles supporting long-term treatment of Lyme disease and Babesiosis.

26. Defendant hired Dr. Avrom Simon, who wrote an independent physician consultant report dated September 8, 2015, recommending that Defendant deny Plaintiff's short-term disability claim. Dr. Simon never spoke to Plaintiff's doctors, except briefly with Dr. Cho, and never spoke to or examined Plaintiff. Dr. Simon was not bound by a duty of care to

Plaintiff, nor can he be sued by Plaintiff for medical malpractice, because he did not have a doctor-patient relationship with Plaintiff.

27. In a letter dated October 12, 2015, Dr. Jemsek responded to Dr. Simon's report and explained (i) the nature of Plaintiff's disease and diagnosis, (ii) the degree of Plaintiff's symptoms and limitations, (iii) the high demands of Plaintiff's job, and (iv) Plaintiff's inability to return to work. After receipt of Dr. Jemsek's letter, Dr. Simon updated his report but maintained his recommendation to deny benefits.

28. On November 4, 2015, Defendant denied Plaintiff's appeal for short-term disability benefits, citing "there is no evidence of any functional impairment precluding Mr. Pappas from performing the essential duties of his occupation," despite Plaintiff's persistent disabling symptoms.

29. Plaintiff sent a letter dated November 5, 2015, to Defendant that included a letter from Dr. Cho that clarified that Plaintiff had declined a particular medication for headache reduction because Plaintiff had experienced severe, intolerable side-effects from a similar medication. This letter refuted the allegation in Dr. Simon's report that Plaintiff declined medication because his symptoms were not severe.

30. On January 14, 2016, Plaintiff submitted a claim to Defendant for long-term disability benefits.

31. On February 9, 2016, Plaintiff, through his counsel, submitted a letter supplementing his January 14, 2016, claim. This supplemental letter contained (i) an explanation of Plaintiff's illness, symptoms, and medications, (ii) a detailed explanation of Plaintiff's test results and diagnoses, (iii) an explanation of how Plaintiff qualifies as "disabled" under the Plan, (iv) Plaintiff's emergency room discharge papers from February 11, 2014; February 14, 2014;

March 23, 2015; and March 28, 2015, (v) a list of Plaintiff's prescribed painkillers used to mitigate his excruciating pain, (vi) three positive Babesiosis laboratory test results dated January 11, 2015; January 14, 2015; and January 15, 2015, (vii) two indeterminate Lyme disease laboratory test results dated January 7, 2015, and January 14, 2015, (viii) Dr. Jemsek's, Dr. Pappas', and Dr. Cho's letters supporting Plaintiff's claim, (ix) a list of medical journal articles supporting the inaccuracy of Lyme disease laboratory tests, (x) medical journal articles supporting long-term treatment of Lyme disease and Babesiosis, (xi) evidence of Plaintiff's intravenous antibiotic treatment, and (xii) Plaintiff's ammonia laboratory test results from July 6, 2015, to January 4, 2016, showing elevated levels.

32. On February 16, 2016, Plaintiff submitted various long-term disability claim forms to Defendant.

33. Following his responsibilities under the Plan, Plaintiff submitted an application to the Social Security Administration ("SSA") for Social Security Disability Insurance ("SSDI") through the Advocator Group on February 20, 2016. Defendant contracts with the Advocator Group because the amount of disability benefits Defendant must pay to its claimants is reduced if the Advocator Group is successful and the claimant is awarded SSDI.

34. Defendant hired Dr. Dupe Adewunmi, whose title was MetLife Disability Medical Director, to review Plaintiff's claim file. In her report dated February 24, 2016, Dr. Adewunmi recommended that Defendant deny Plaintiff's claim because "the medical information on file did not support functional limitations for the time period in question." Dr. Adewunmi never spoke to Plaintiff's doctors and never spoke to or examined Plaintiff. Dr. Adewunmi was not bound by a duty of care to Plaintiff, nor can she be sued by Plaintiff for medical malpractice, because she did not have a doctor-patient relationship with Plaintiff.

35. On February 25, 2016, Plaintiff sent Defendant an "Attending Physician Statement" signed by Dr. Jemsek as required by Defendant.

36. On February 26, 2016, Dr. Adewunmi provided an addendum to her report, noting the Attending Physician Statement, but maintaining her conclusion to deny disability benefits.

37. On March 15, 2016, Plaintiff's treating physician, Dr. Jemsek, submitted a letter in response to Dr. Adewunmi's report. Dr. Jemsek explained (i) the nature of Plaintiff's diseases; (ii) Plaintiff's symptomatology; (iii) the evidence supporting the diagnoses; (iv) the nature, difficulty, and success of Plaintiff's treatment; and (v) Plaintiff's inability to return to work.

38. Because Dr. Adewunmi noted the lack of a diary in her report, Plaintiff submitted to Defendant on March 16, 2016, his 94-page personal diary (for dates December 13, 2014-March 7, 2016) that listed his daily symptoms (excruciating headache, cognitive dysfunction, stomach pain, eye pain, testicular pain, fatigue, tinnitus, etc.), visits to the emergency room, and lists of medications.

39. On March 17, 2016, Plaintiff's parents faxed a letter to Defendant asking Defendant to approve Plaintiff's claim for long-term disability. In their letter, Plaintiff's parents, his caregivers, refute in detail each of Dr. Adewunmi's reasons for concluding that Plaintiff's disability claim should be denied.

40. Defendant hired Dr. Joseph Vinetz to review Plaintiff's claim. Dr. Vinetz submitted a report dated March 31, 2016, denying Plaintiff's claim because "the medical information does not support functional limitations physical beyond 04/30/15 . . . . there is no evidence provided to support an infectious disease diagnosis." Dr. Vinetz repeated multiple times in his report that there is no evidence of an infectious disease, despite the multiple positive

and indeterminate test results provided by Plaintiff. Dr. Vinetz never spoke to Plaintiff's doctors and never spoke to or examined Plaintiff. Dr. Vinetz was not bound by a duty of care to Plaintiff, nor can he be sued by Plaintiff for medical malpractice, because he did not have a doctor-patient relationship with Plaintiff.

41. Dr. Vinetz submitted a revised report dated April 20, 2016, inexplicably adding that Plaintiff's Babesiosis test results were false positives, even though Plaintiff submitted three positive test results, each from a different laboratory, including a blood smear in which the stained parasites are clearly visible. Dr. Vinetz writes regarding the test results that "[n]o controls are presented and this test is not recognized as a plausible test," which is simply incorrect.

42. On April 27, 2016, Defendant denied Plaintiff's claim for long-term disability benefits, stating "[w]hile Metlife acknowledges that you may have symptoms warranting treatment, the medical information does not support a physical limitation that would prevent you from performing the duties of your own job from your day last worked through the present time."

43. On September 5, 2016, SSA awarded Plaintiff SSDI benefits retroactively from October 2015. SSA concluded that Plaintiff satisfied SSA's definition of "disabled," which requires that Plaintiff is not able to engage in substantial gainful activity because of a medically-determinable physical or mental impairment that has lasted or is expected to last for a continuous period of at least 12 months. This is a much higher standard than required by the Plan.

44. On October 25, 2016, Plaintiff, through counsel, appealed the denial of long-term disability benefits. In the appeal, Plaintiff provided (i) an explanation of why the claim denial should be reversed, (ii) a clarification of why Plaintiff qualified as disabled under the Plan, (iii)

Plaintiff's medical evaluations and documentation of difficulties with activities of daily living (ADLs), (iv) SSA's award of disability benefits, and (v) a legal analysis of Plaintiff's claim.

45. Plaintiff, through counsel, submitted a supplemental appeal letter dated January 6, 2017 which (i) explained how Defendant violated ERISA's full and fair review rule, (ii) described how Defendant's peer reviewers acted arbitrarily and capriciously in reaching their conclusions, and (iii) provided an ImPACT Neurocognitive Evaluation completed by Body Dynamics Inc. This evaluation consisted of a three-day simulation of Plaintiff's regular occupation, designed to assess and measure Plaintiff's attention span, working memory, sustained and selective attention time, non-verbal problem solving, and reaction time pre and post exposure to simulated work environment. The evaluation concluded that Plaintiff suffers from severe cognitive deficits that prevent Plaintiff from performing his regular occupation. On the last day of the simulation Plaintiff's symptoms were so painfully exacerbated that he was forced to go to the emergency room.

46. On January 26, 2017, Dr. Jemsek sent a letter to Defendant pointing to Plaintiff's elevated bilirubin levels in March 2015 as further evidence of Plaintiff's infection of Babesiosis.

47. Defendant hired Dr. Keven Murphy and Dr. Sanjay Patel to review Plaintiff's claim. Dr. Murphy submitted a report dated February 8, 2017 and Dr. Patel submitted a report dated February 14, 2017, both concluding that Plaintiff's medical information did not support functional limitations. Neither Dr. Murphy nor Dr. Patel ever spoke to Plaintiff's doctors, and neither spoke to or examined Plaintiff. Neither Dr. Murphy nor Dr. Patel was bound by a duty of care to Plaintiff, nor can they be sued by Plaintiff for medical malpractice, because they did not have a doctor-patient relationship with Plaintiff.

48. In his report, Dr. Murphy posed three questions specifically to Dr. Richard Cho, Plaintiff's neurologist. Dr. Cho submitted a response to Defendant on February 17, 2017, which addressed said questions.

49. On February 27, 2017, Dr. Jemsek sent a letter to Defendant which (i) explained how Dr. Patel's assertion that Plaintiff's Babesiosis test results were false positives is nonsensical, (ii) described the severity of Plaintiff's health issues, and (iii) clarified why Plaintiff was unable to return to work.

50. On March 15, 2017, Plaintiff, through counsel, responded to Dr. Murphy's and Dr. Patel's reports and asserted the inappropriateness of Dr. Murphy and Dr. Patel's reviews and addressed Defendant's continued failure to address the question of disability as defined in the Plan.

51. On March 27, 2017, Defendant denied Plaintiff's appeal for long-term disability benefits. The letter asserted that "The medical documentation failed to support a finding of restrictions or limitations that would prevent Mr. Pappas from performing his regular occupation, as of April 30, 2015, and throughout the elimination period." However, in the preceding paragraph Defendant stated that "Mr. Pappas' file was also reviewed by a Board Certified Internal Medicine and Infectious Disease IPC who opined the medical information on file *supported* physical functional restrictions and limitations, as of April 30, 2015, and throughout the elimination period" (emphasis added). This statement supports finding that Plaintiff is disabled and approving Plaintiff's long-term disability benefits claim, and makes Defendant's denial additionally arbitrary and capricious.

52. It is clear that Defendant and its paid consulting physicians ignored the medical documentation submitted by Plaintiff because Plaintiff's ImPACT Neurocognitive Evaluation,

symptom diary, emergency room visits, mounds of medications, intravenous treatment, caregiving by his parents, test results, doctors' letters/notes, and other documentation, all clearly support restrictions and limitations that would prevent Plaintiff from performing each of the material duties of his exceptionally demanding regular occupation and therefore qualify him as disabled under the terms of the Plan.

53. Defendant's disregard in its final March 27, 2017, denial letter of SSA's award of SSDI to Plaintiff, stating that SSA's "determination is separate from and governed by different standards than MetLife's review and determination," is arbitrary and capricious. It fails to explain why the SSA decision was discredited, especially considering how the definition of disability is more difficult to satisfy under SSA than under the Plan.

54. Defendant failed and refused to provide Plaintiff benefits under the Plan since May 29, 2015.

55. As a participant in an ERISA plan, Plaintiff was entitled to receive a full and fair review of his claims for benefits. As part of this full and fair review Defendant was required to fully consider all evidence submitted and Plaintiff was entitled to receive written notice setting forth the complete basis for the denial of benefits, what evidence would be necessary to perfect the claim, and an opportunity to rebut the reasons for denial.

56. Plaintiff complied with the terms of the Plan and ERISA and submitted evidence of his disability to Defendant. However, Defendant violated the terms of the Plan and ERISA by failing to provide the benefits payable under the Plan and failing to provide a full and fair review of Plaintiff's claim as required by ERISA.

57. Plaintiff has exhausted his administrative remedies. All conditions and prerequisites for this lawsuit have been satisfied.

58. By virtue of the foregoing allegations, there exists an actual controversy and denial of right with regard to Plaintiff's entitlement to disability benefits, and Plaintiff hereby invokes the jurisdiction of this court to declare the right of Plaintiff to disability benefits under the Plan, and to decree specific enforcement of these rights and related relief in implementation of its terms.

59. At all relevant times herein, Defendant acted under a conflict of interest in making the final decision that Plaintiff is not entitled to Disability Benefits; accordingly, the final decision should be given no deference.

## COUNT I: FAILURE TO PROVIDE BENEFITS UNDER ERISA

60. Plaintiff alleges and incorporates by reference paragraphs 1 through and including 59 above.

61. The disability coverage provided to Plaintiff was part of an "employee welfare benefit plan" within the meaning of 29 U.S.C. § 1002(1) in that the Plan was established and maintained for the purpose of providing its participants or their beneficiaries with disability benefits through the purchase of insurance.

62. Plaintiff was a plan "participant" of the employee welfare benefit Plan established and maintained by Employer within the meaning of 29 U.S.C. § 1002(7), in that he was eligible to receive disability benefits from the Plan.

63. Defendant is a fiduciary with respect to the Plan within the meaning of 29 U.S.C. § 1002(21) in that it may exercise discretion with respect to decisions regarding the benefits.

64. Plaintiff has a disability as defined by the Plan and is entitled to benefits under the terms of the Plan, and any amendments or modifications thereof.

65. Plaintiff complied with all Plan terms and requirements in requesting Disability Benefits and provided Defendant with information documenting his disability.

66. Defendant violated the requirements of ERISA, 29 U.S.C. § 1132(a)(1)(B), by denying benefits under the Plan, for which Plaintiff was eligible, despite Plaintiff's clear documentation of disability.

67. The denial of Disability Benefits by Defendant was and is not supported by the preponderance of the evidence and is erroneous as a matter of law and in violation of ERISA.

68. Further, the denial of Disability Benefits by Defendant was and is arbitrary, capricious, not made in good faith, unsupported by substantial evidence, a result of a conflict of interest, and an abuse of discretion.

69. The Plan does not reserve discretionary authority to the plan administrator; therefore, the standard of review applicable to Plaintiff's claim is *de novo* review.

70. As a direct and proximate result of the actions of Defendant, Plaintiff has lost monthly Disability Benefits since May 29, 2015, and continues to accrue a loss of monthly benefits.

71. As a direct and proximate result of the actions of Defendant, Plaintiff has been caused to incur attorney's fees in an attempt to secure payment of Disability Benefits justly due to him.

**COUNT II: ERISA VIOLATION – NO FULL AND FAIR REVIEW**

72. Plaintiff alleges and incorporates by reference paragraphs 1 through and including 71 above.

73. The disability coverage provided to Plaintiff was part of an "employee welfare benefit plan" within the meaning of 29 U.S.C. § 1002(1) in that the Plan was established and

maintained for the purpose of providing its participants or their beneficiaries with disability benefits through the purchase of insurance.

74. Defendant is a fiduciary with respect to the Plan within the meaning of 29 U.S.C. § 1002(21) in that it may exercise discretion with respect to decisions regarding benefits.

75. Plaintiff was at all relevant times, a plan participant of the employee welfare benefit Plan established and maintained by Employer, within the meaning of 29 U.S.C. § 1002(7), in that Plaintiff was eligible to receive benefits from the employee benefit Plan which covered the employees of Employer.

76. Plaintiff is disabled and is entitled to continuing disability benefits under the terms of the Plan.

77. Defendant violated ERISA by failing to provide a full and fair review as set forth above and as required by 29 U.S.C. § 1133.

## COUNT III: BREACH OF FIDUCIARY DUTY

78. Plaintiff alleges and incorporates by reference paragraphs 1 through and including 77 above.

79. By virtue of its position as fiduciary of the Plan, Defendant owed a fiduciary duty of prudence, loyalty, and care to Plaintiff under section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1), including a duty to act solely in the interest of Plan participants and beneficiaries and for the exclusive purpose of providing Plan benefits to participants and beneficiaries.

80. Defendant has failed to act with the requisite prudence, breached this fiduciary duty owed to Plaintiff, and injured Plaintiff, by, among other things:

a. Failing to administer the Plan solely in the interest of participants and beneficiaries for the exclusive purpose of providing benefits for the participants and their beneficiaries;

b. Failing to consider relevant information submitted by Plaintiff and his medical providers;

c. Failing to provide relevant Plan documents and materials to Plaintiff; and

d. Operating under a conflict of interest.

81. Defendant has been unjustly enriched by breaching this fiduciary duty.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands the following relief against Defendant:

A. A declaration obligating Defendant to provide Plaintiff with short-term and long-term disability benefit payments and mandating continued payment of monthly benefits so long as Plaintiff remains disabled within the meaning of the Plan for the remainder of his life;

B. That Plaintiff be awarded short-term and long-term disability benefits as provided under the Plan, plus pre-judgment interest from the denial date of May 29, 2015;

C. That Plaintiff be awarded reasonable attorneys' fees in addition to litigation expenses and costs pursuant to 29 U.S.C. § 1132(g); and

D. Such other and further relief as this Court deems just and appropriate.

Dated: August 22, 2017

Respectfully submitted,

________________________________

Kenneth Wu (DC Bar No. 490601)
Lopez & Wu, PLLC

1818 Library Street, Suite 500
Reston, VA 20190
703-835-6145 (P)
703-831-0181 (F)
kwu@lopezandwu.com

Attorney for Plaintiff